Filed 9/8/23  Marriage of Kimbrell CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of HANNA and JAMES KIMBRELL. | D078459 |
| HANNA PEREZ,<br><br>    Appellant and Cross-respondent,<br><br>    v.<br><br>JAMES KIMBRELL,<br><br>    Respondent and Cross-appellant. | (Super. Ct. No. D563107) |

APPEAL from a judgment of the Superior Court of San Diego County, Christine K. Goldsmith, Temporary Judge.  (Pursuant to art. VI, § 21 of the Cal. Const.)  Reversed in part and affirmed as modified.

David A. Kay for Appellant and Cross-respondent.

Stephen Temko for Respondent and Cross-appellant.

Appellant and cross-respondent Hanna Kimbrell Perez (Wife) and respondent and cross-appellant James Kimbrell (Husband) were married for

1

six and one-half years. At the time of their marriage, Husband owned or controlled through a trust, as his separate property, 77 percent of the shares of La Mesa R. V. Center, Inc. (LMRV), a business involved in the sales and service of recreational vehicles (RVs). During their marriage, the value of LMRV increased greatly, from $22,784,000 in 2010 to $106,165,000 in 2016. During their marriage, the parties also purchased a home in Del Mar (the Property) for about $6.3 million with down payments from Husband and Wife and the remaining $4.7 million in funds from LMRV.

In 2016, Wife filed a petition for dissolution of their marriage. In 2020, a trial was conducted before the Honorable Christine K. Goldsmith (Ret.), a privately compensated temporary judge to which the parties had stipulated to decide the matter pursuant to California Rules of Court, rule 2.831. After trial, the court entered its judgment of dissolution, which attached and incorporated its statement of decision regarding various contested issues. Regarding LMRV, the court apportioned the increase in the value of LMRV between the community's and Husband's separate property interests by applying the approach in *Van Camp v. Van Camp* (1921) 53 Cal.App. 17 (*Van Camp*), finding that Husband was not the principal factor accounting for the increased value of LMRV during the marriage. The court found that the community was undercompensated by LMRV for Husband's services during the marriage in the amount of $837,000 and then reduced that amount by $115,000 for jewelry purchased for Wife with community funds paid from LMRV in excess of Husband's draw account, leaving a net amount of $722,000 that was divided equally between the parties for their community shares. The court then awarded Husband his ownership interest in LMRV as his separate property.

2

Regarding the purchase of the Property, the court found that the initial transfer of $4.7 million from LMRV to the escrow account was a loan by LMRV, which was documented with an unsecured promissory note signed by the parties that was payable on demand. A few months later, the parties obtained a $2 million loan from Citibank, which loan was secured by a first trust deed on the Property, and the loan proceeds were used to pay down the balance of the LMRV loan. Thereafter, the parties signed a new promissory note in the face amount of $4.7 million payable to LMRV, which note had a two-year term and was secured by a second trust deed on the Property. The court found that the second LMRV promissory note replaced the first LMRV promissory note and that the then-current outstanding balance of the second note was $2,838,145.66. The court found that the Property was community property and ordered that it be sold and the proceeds be divided equally between the parties after payment, among other things, of its Family Code section 2640[1] reimbursement awards to Husband of $642,993 and to Wife of $550,000.

On appeal, Wife contends that the court erred by: (1) applying the approach in *Van Camp*, *supra*, 53 Cal.App. 17, rather than the approach in *Pereira v. Pereira* (1909) 156 Cal. 1 (*Pereira*), in apportioning the interests of the community and Husband in LMRV; (2) deducting $115,000 from the gross amount of the community's undercompensation by LMRV for jewelry purchased with LMRV funds and given by Husband to her; and (3) implicitly finding the source of the initial $4.7 million in funds from LMRV to purchase the Property was Husband's separate property, not finding the second LMRV note and trust deed were invalid for lack of consideration, and finding

---

[1]     All statutory references are to the Family Code unless otherwise specified.

3

Husband did not breach his fiduciary duties to her in arranging the first and second LMRV loans and using the proceeds of the Citibank loan to pay down the LMRV loan.

In his cross-appeal, Husband contends that substantial evidence does not support the court's section 2640 reimbursement award of $550,000 to Wife because: (1) his transfers of funds to her LMRV account did not transmute those funds to her separate property; and (2) she did not present any documentary evidence tracing the source of the funds that she contributed toward the purchase price for the Property to her separate property.

As discussed below, we reject Wife's contentions and agree, in part, with Husband's contentions. In particular, we agree that there is insufficient documentary or other evidence to support $450,000 of the court's award of $550,000 to Wife for section 2640 reimbursement and therefore reverse and vacate that award to that extent. Rather than remanding the matter, we elect to modify the judgment accordingly and affirm the judgment as so modified.

FACTUAL AND PROCEDURAL BACKGROUND

In 1972, Husband, along with others, founded LMRV. On March 19, 2010, Husband, then 68 years old, and Wife, then 48 years old, married. At the time of their marriage, the shares of LMRV's stock were owned as follows: 77 percent by Kimbrell Family LLC (KF LLC), of which Husband was the managing officer and principal owner, 19.25 percent by James Walters, and 3.75 percent by LMRV's employee stock option plan (ESOP). In 2010, LMRV was valued at $22,784,000.

By the end of 2015, LMRV had repurchased all of the shares held by Walters and the ESOP, and, after giving portions of his interest in KF LLC to

4

his children for estate planning purposes, Husband owned 21.4 percent of KF LLC and LMRV.

In February 2016, the parties purchased the Property, a home on 27th Street in Del Mar, for about $6.3 million. The purchase price was primarily paid with down payments made by each of Husband and Wife and a $4.7 million transfer of funds from LMRV that was arranged by Husband. LMRV considered its transfer to be a loan and on or about February 1, the parties signed an unsecured promissory note in the principal amount of $4.7 million that was payable on demand. In late April, the parties obtained a $2 million loan from Citibank, which was secured by a first trust deed on the Property, and the proceeds were then used to pay down the balance of the $4.7 million loan from LMRV. On May 19, the parties signed a second promissory note in the face amount of $4.7 million in favor of LMRV, which loan had a two-year term and was secured by a second trust deed on the Property.

On about September 1, 2016, the parties separated and, one week later, Wife filed a petition for dissolution of their marriage. At that time, LMRV was valued at $106,165,000. In 2019, the parties stipulated to have their dispute decided by a privately compensated temporary judge, who then conducted a nine-day trial in 2020. On June 4, 2020, the court issued its 31-page statement of decision. On November 4, 2020, the court entered its judgment, which attached and incorporated its statement of decision. Wife filed a notice of appeal challenging the judgment and Husband filed a notice of cross-appeal.

DISCUSSION

I

*General Principles of Appellate Review*

A

*Presumption of correctness*

On appeal, the judgment or order being challenged is presumed to be correct and an appellate court generally reviews the trial court's ruling and not its reasons in support of its ruling. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609 (*Jameson*); *Young v. California Fish & Game Com.* (2018) 24 Cal.App.5th 1178, 1182-1193.) "All intendments and presumptions are indulged to support [the judgment or order] on matters as to which the record is silent, and error must be affirmatively shown [by the appellant]." (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*).) "[T]he burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson*, at p. 609.)

To overcome the presumption of correctness, an appellant must provide an adequate record on appeal and present argument and legal authority on each contention showing that the trial court erred. (*Jameson*, *supra*, 5 Cal.5th at pp. 608-609; *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 565.) An appellate court does not act as appellant's counsel and furnish a legal argument showing that the trial court erred. (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368.) Accordingly, if an appellant fails to support a contention with reasoned argument and citations to authority, an appellate court may treat that contention as waived and decline to consider its merits. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*);

6

*Salas v. California Dept. of Transportation* (2011) 198 Cal.App.4th 1058, 1074 (*Salas*).)

B

*Standards of review on appeal*

In addressing each contention on appeal, the threshold issue is to determine the proper standard of review to apply. (*Clothesrigger, Inc. v. GTE Corp.* (1987) 191 Cal.App.3d 605, 611.) An appellant's contentions should be tailored to the applicable standard of appellate review and a failure to acknowledge or apply the proper scope of review may be considered to be a concession of a lack of merit for that contention. (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465 (*Sonic Manufacturing Technologies, Inc.*).) The three primary standards for appellate review are: (1) the substantial evidence standard of review; (2) the abuse of discretion standard of review; and (3) the independent, or de novo, standard of review. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2022) ¶¶ 8:33 - 8:35, p. 8-19.)

1. *Substantial evidence standard of review*

When a trial court has resolved a disputed factual issue, we apply the substantial evidence standard of review. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) Substantial evidence is not synonymous with any evidence or a mere scintilla of evidence, but is only evidence that is of ponderable legal significance, reasonable in nature, credible, and of solid value. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005-1006; *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873.) The testimony of a single credible witness may constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) In applying the substantial evidence standard of review, we accept all evidence supporting

the trial court's judgment or finding, completely disregard contrary evidence, and draw all reasonable inferences from the evidence to support the judgment or finding. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581-582 (*Schmidt*).) We determine only "if substantial evidence exists to support [the judgment or finding] in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events." (*Id.* at p. 582.)

Furthermore, at a bench trial, the trial court is the sole judge of witness credibility and may disregard the testimony, contradicted or uncontradicted, of any witness if there is any rational ground for doing so. (*Schmidt*, *supra*, 44 Cal.App.5th at p. 582; *Davis v. Kahn* (1970) 7 Cal.App.3d 868, 874 (*Davis*).) We cannot reweigh the evidence, substitute our own inferences from the evidence, or make different assessments of credibility from the trial court's assessments. (*Schmidt*, at p. 582; *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1329 (*Ana C.*).) An appeal is not a "retrial" of the case or an opportunity for an appellant to rehash arguments about the strength of the evidence. (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 102 (*Paterno*); Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, at ¶ 9:23, p. 9-7.) We defer to a trial court's determination of credibility or other factual issues because it has had the benefit of observing the demeanor of witnesses and is therefore in a better position than an appellate court to assess credibility. (*In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172, 1175; *Catherine D. v. Dennis B.* (1990) 220 Cal.App.3d 922, 931.)

When an appellant challenges the sufficiency of evidence to support a judgment or finding, the appellant's opening brief must set forth all the material evidence on that issue and cannot merely state facts favorable to the

8

appellant.  (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)  The appellant must provide a fair summary of the evidence.  (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739.)  When an appellant's opening brief states only evidence favorable to the appellant's position and ignores evidence supporting the judgment or finding, we may treat the substantial evidence contention as waived and presume the record contains evidence to support the trial court's factual findings.  (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1072; *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.)  In such cases, we are not required to undertake an independent examination of the record on appeal.  (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409-410.)

    2.  *Abuse of discretion standard of review*

When an appellant challenges a trial court's discretionary decision, we apply the abuse of discretion standard of review.  Under that standard of review, we will find reversible error only if the trial court clearly abused its discretion and there was a miscarriage of justice.  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331 (*Blank*).)  A trial court abuses its discretion when its action is arbitrary, capricious, or exceeds the bounds of reason.  (*In re Cortez* (1971) 6 Cal.3d 78, 85; *Fasuyi v. Permatex, Inc.* (2008) 167 Cal.App.4th 681, 695; *Denham*, *supra*, 2 Cal.3d at p. 566.)  It is the appellant's burden on appeal to show an abuse of discretion.  (*Blank*, at p. 331.)  We will find an abuse of discretion by a trial court only when we conclude that under all the circumstances, viewed most favorably in support of the decision, no judge reasonably could have made that decision.  (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 104.)

3. *Independent, or de novo, standard of review*

When an appellant challenges a trial court's decision regarding a pure question of law on undisputed facts, we apply the independent, or de novo, standard of review. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191 (*Aryeh*); *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 (*Ghirardo*).) Under that standard, we do not defer to the trial court's ruling or reasoning and instead decide the matter anew. (*Aryeh*, at p. 1191; *Ghirardo*, at p. 799.) For example, we decide independently the proper interpretation of a statute and are not bound by the trial court's interpretation. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527.) Likewise, we independently decide the question of law regarding the correct application of an interpreted statute to undisputed facts. (*International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606, 611.)

WIFE'S APPEAL

II

*LMRV Apportionment*

Wife contends that the trial court erred by applying the approach in *Van Camp*, *supra*, 53 Cal.App. 17, rather than the approach in *Pereira*, *supra*, 156 Cal. 1, in apportioning the interests of the community and Husband in LMRV. In particular, she argues the evidence showed that Husband was the chief contributing factor in the increase in LMRV's value during their marriage.

A

*General principles regarding apportionment of increase
in value of separate property business*

In general, under California's community property law, property acquired during marriage is presumptively community property (§ 760), and property acquired by a spouse before marriage, property acquired during

10

marriage by gift, bequest, devise, or descent, and profits from such property, are presumptively the separate property of a spouse (§ 770, subd. (a)). (*In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1472 (*Brandes*).) Although income from separate property and the intrinsic increase in the value of separate property is separate, "the fruits of the community's expenditures of time, talent, and labor are community property." (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 850 (*Dekker*).)

In *Brandes*, we stated: "When a spouse's personal efforts increase the value of his or her separate property business, 'it becomes necessary to quantify the contributions of the separate capital and community effort to the increase,' because the 'community is entitled to the increase in profits attributable to [the] community endeavor.' [Citations.]" (*Brandes*, *supra*, 239 Cal.App.4th at p. 1472.) "California courts have developed two alternative approaches to allocating business profits between separate and community estates." (*Id.* at pp. 1472-1473) The two approaches are the *Pereira* approach and the *Van Camp* approach. (*Id.* at p. 1473.) " '*Pereira* is typically applied where business profits are principally attributed to efforts of the community.' " (*Dekker*, *supra*, 17 Cal.App.4th at p. 853.) In applying the *Pereira* approach, a trial court "allocate[s] a fair return to the separate property investment and allocate[s] the balance of the increase value to community property as arising from community efforts." (*Id.* at pp. 852-853.) "Conversely, *Van Camp* is applied where community effort is more than minimally involved in a separate business, yet the business profits accrued are attributed to the character of the separate asset." (*Id.* at p. 853.) In deciding whether to apply the *Pereira* approach or the *Van Camp* approach, the crucial determination for the trial court is whether the spouse's community efforts *or* factors other than the spouse's efforts were the chief

11

contributing factors for the business's increased value.  (*Beam v. Bank of America* (1971) 6 Cal.3d 12, 18 (*Beam*); *Logan v. Forster* (1952) 114 Cal.App.2d 587, 599.)  Alternatively stated, the question is whether the business's increased value was "principally attribut[able] to" the spouse's efforts *or* instead factors other than the spouse's efforts.  (*Dekker*, at p. 853.)  When applying the *Van Camp* approach, a trial court "determine[s] the reasonable value of the community's services, allocate[s] that amount to community property and the balance to separate property."  (*Ibid.*)

In selecting an apportionment approach, a trial court is not bound by any precise criterion or standards.  (*Beam*, *supra*, 6 Cal.3d at p. 18.)  Rather, the court may select whichever approach or formula that will achieve substantial justice between the parties (i.e., that approach which is most appropriate and equitable in a particular situation) depending on whether the character of the capital investment in the separate property or the personal activity, ability, and capacity of the spouse is the chief contributing factor in the realization of income and profits.  (*Ibid.*)

Although appellate courts generally apply the substantial evidence standard in reviewing a trial court's characterization of property as separate or community, they apply the abuse of discretion standard in reviewing a trial court's selection of an apportionment approach and its allocation of the community's interest in a spouse's separate business.  (*In re Marriage of Brooks* (2019) 33 Cal.App.5th 576, 588 (*Brooks*); *Brandes*, *supra*, 239 Cal.App.4th at p. 1473; *Dekker*, *supra*, 17 Cal.App.4th at p. 849.)  A trial court abuses its discretion when it exceeds the bounds of reason in the circumstances of the case by acting outside the permissible range of options set by the legal criteria.  (*Brandes*, at pp. 1473-1474; *Denham*, *supra*, 2 Cal.3d at p. 566.)  The appellant has the burden on appeal to show an abuse

of discretion.  (*Brandes*, at p. 1473.)  However, unless there is a clear case of abuse of discretion and there has been a miscarriage of justice, we will not substitute our opinion and thereby divest the trial court of its discretionary power.  (*Ibid*.)  If there is a reasonable or fairly debatable justification for the ruling, we will not set it aside.  (*Id*. at p. 1474.)

We apply the substantial evidence standard in reviewing a trial court's findings of fact, including a finding on whether the contributions of other persons, rather than a spouse's contributions, caused the increase in the value of a separate property business during marriage.  (*Brooks*, *supra*, 33 Cal.App.5th at p. 593.)  In reviewing a finding of fact, we determine whether there is any substantial evidence, contradicted or uncontradicted, to support that finding.  (*Brandes*, *supra*, 239 Cal.App.4th at p. 1472; *Schmidt*, *supra*, 44 Cal.App.5th at p. 582.)  All conflicts in the evidence, and all reasonable inferences therefrom, are resolved in favor of the finding.  (*Brandes*, at p. 1472; *Schmidt*, at pp. 581-582.)

B

*Trial evidence*

At trial, the parties presented extensive percipient and expert testimony and voluminous documentary evidence on the increase in value of LMRV during the marriage and how that increase in value should be apportioned between the community and Husband's separate property. Husband and many other LMRV managers and employees testified regarding, among other things, LMRV's management, business practices, and sales growth and decline during the period from its formation in 1972

13

through the parties' separation in 2016.[2] As Husband notes, Walters and OConnor testified that the RV industry has historically been cyclical in nature and there was a correlation between the health of the economy and the number of RVs sold by LMRV. Walters testified that the biggest factor in LMRV's growth was its taking advantage of a strong economy. For example, the RV business had a downcycle in the late 1980's and 1990's when interest rates were high, an upcycle after the September 11, 2001 attack, and then a downcycle during the great recession that began in 2008. During the great recession, LMRV, along with the entire RV industry, experienced precipitous drops in RV sales because RVs are not necessities and, as a result, LMRV reduced the number of its employees from about 1,500 in 2004 to 350 or 400 in 2009. As a result of the great recession, LMRV's revenues decreased and that decrease was not the result of anything Husband did or did not do. Beginning in 2010, after the great recession, there was pent-up demand for RVs and LMRV's sales increased dramatically as "baby boomers" experienced growth in their wealth (e.g., investments in the stock market and real estate) and purchased RVs with historically low interest rate loans. That "meteoric" growth in RV sales during that period of economic recovery was experienced by the entire RV industry and not just LMRV. As a result of that industry-wide growth, Upton testified that he could not give Husband credit for LMRV's growth during that period.

In addition to the evidence primarily attributing LMRV's growth during the marriage to the growth in the national economy after the great recession, there was extensive testimony that LMRV's growth was also attributable to management employees other than Husband. Walters, Upton,

---

2    Specifically, Husband, Walters, Robert Upton, Timothy OConnor [*sic*], Kelly Sundstrom, Jason Kimbrell (Jason), and Joanne Erwin testified at trial.

14

OConnor, Sundstrom, and Jason testified regarding their past and present job titles and duties and those of other LMRV employees and described LMRV's management approach and practices. Until his retirement in 2015, Walters was LMRV's president and ran its weekly management meetings. After Husband and Walters hired Upton as a salesperson in the early 1990's, Upton rose through the ranks of store manager, general sales manager, vice president of sales, vice president of sales and services, senior vice president, and, ultimately, president of LMRV in 2017. Sundstrom had been LMRV's controller since 1998 and was its chief accountant and regulatory compliance manager. In 2004, Walters hired OConnor as LMRV's chief financial officer and, as such, he was responsible for LMRV's banking relationships and negotiations for leases and purchases. OConnor was known in the industry as "Mr. RV" and his efforts for LMRV were described as "invaluable." Jason also rose through the ranks from salesperson in 1993 to, ultimately, president of LMRV in 2018. Jason's "lane" was managing manufacturer relationships and LMRV's inventory.

Each member of LMRV's management team had his or her "lane" of expertise. An expert in a certain lane would make his or her recommendation regarding day-to-day operations and major business decisions and then the management team would collectively discuss it and then decide whether it agreed or not. Walters ran LMRV's weekly management meetings, which Husband never attended. During the parties' marriage, Husband was not involved in decisions on day-to-day operations. Regarding hiring and firing of key employees, borrowing money, spending large amounts of money, major changes in inventory, and other major business decisions, the management team would make a decision and then submit its recommendation to Husband who had the "final say." During the

15

marriage, Husband almost never exercised his veto power to reject a major business decision made by the management team.[3]

LMRV's management team was consistent from 2004 through 2015 and its strong management team was one reason LMRV survived the great recession during the late 1990's. Jason testified that although Husband's efforts "definitely" contributed to LMRV's growth, its growth was a "team effort" and no one person was responsible for it. In particular, no one person was responsible for LMRV's growth in other states (i.e., Arizona, Florida, and New Mexico). Jason testified that although no single employee was responsible for LMRV's growth, it was Upton who was primarily responsible for managing LMRV's culture and team building. In turn, Upton testified that no one person was responsible for LMRV's growth, because its management employees functioned well as a team. OConnor concurred, testifying that no one person was responsible for LMRV's growth during the parties' marriage because its growth was "a market effect." In the early 2000's, without Husband's involvement, Walters developed, and LMRV's management team adopted, LMRV's core value that the "customer is the king" and its acronym "FAMILY" (i.e., fun, attitude, make their day, integrity, listen, and quality). Also, Walters and another employee developed LMRV's "everyday low price" marketing program. During the marriage, Husband also had very little contact with manufacturers. Rather, Walters and Upton primarily handled LMRV's relationships with manufacturers. OConnor's strong relationships with banks enabled LMRV to survive the

---

[3]    One exception was when Husband disagreed with the management team regarding whether to procure a lease for a Florida property (i.e., the Boynton Beach project), but that lease and project ultimately did not go forward. Also, before the marriage, Husband overrode the management team's decision only once (i.e., regarding LMRV's purchase of a $19 million airplane).

great recession. During that period, Husband had little contact with banks and even less contact during the marriage. OConnor described Husband's role with banks as LMRV's "figurehead."

Compensation of LMRV's management employees was linked to its growth and net profits. About one-half of the management team's compensation was based on LMRV's profits. In 2007, LMRV's management team improved its service department, which experienced dramatic growth during the marriage. Also, LMRV's existing centralized advertising program contributed to LMRV's growth during the marriage. During the marriage, Husband had little, if any, involvement with LMRV's customers or technology.

There was also evidence presented regarding Husband's health problems and their impact on his involvement in the management of LMRV. In February 2009, before the parties' marriage, Husband suffered a heart attack, which required multiple bypass surgery. His recovery took about one and one-half years before he could visit store locations again. During his recovery, LMRV's management team ran the business and, even after his return to the office, Husband worked a "lot less" and his involvement in the business was limited.

Husband presented the expert testimony of Kimberly Linebarger and Wife presented the expert testimony of Tony Yip. Each testified regarding the valuation of LMRV, apportionment of its increase in value between the community and Husband's separate property, and reasonable compensation to the community for Husband's efforts during the marriage. Linebarger was employed by Moss Adams and worked on business valuations for RV and other vehicle dealers. Linebarger considered factors that affected LMRV's value, including external factors, such as the national and local economies

17

and industry trends, and internal factors, such as store locations, the management team, manufacturing and banking relationships, customer relationships, and business processes. She testified that the national economic environment was "really impactful" on LMRV's value, that RV sales were related to discretionary income, and, when unemployment rates decreased, RV sales increased. When the United States gross national product (GNP) grew, sales in the RV industry as a whole, as well as LMRV's sales, also grew. In the areas in which LMRV had store locations, those local economies followed the national trends. LMRV's sales followed the general trends of the RV industry and therefore its value was not tied to one specific person or what was happening inside the company.

Linebarger also testified that the longer that a management team has been in place, the less direction it would need. LMRV's demonstrated ability to open new store locations prior to the marriage showed it had an established core for growth during the marriage and thereafter. She also testified that before the marriage LMRV had strong relationships with manufacturers, including with two of the top manufacturers, which relationships were not dependent on Husband and gave LMRV a competitive advantage in its markets. Likewise, LMRV's relationships with banks were dependent on OConnor, not Husband. LMRV's relationships with its customers were also not dependent on Husband or his personality. During the marriage, LMRV's management team continued to manage the business as it had before the marriage and did not change its management strategy.

Linebarger testified that the increase in LMRV's value during the marriage was far more due to passive factors than active factors and was not tied to one specific individual's efforts. In particular, she opined that

Husband was not the "primary driver" of any increase in the value of LMRV during the marriage, although he contributed to its growth.

In contrast, Yip testified that a very significant portion, or almost one-half, of LMRV's increase in value during the marriage was in part due to its addition of new store locations, which he understood was because of Husband's efforts. Yip calculated the "EBITDA" (i.e., earnings before interest, taxes, depreciation, and amortization) from LMRV's new store locations versus its established locations from 2010 through 2016. He concluded that 39 percent of LMRV's EBITDA during the marriage was due to its new stores.[4] Yip testified he accepted and adopted the $22,784,000 determination made by Moss Adams (Linebarger's company) of LMRV's value on the date of marriage in 2010 and $106,165,000 on the date of separation in 2016, resulting in an increase of $83,381,000 in LMRV's value during the marriage. Applying his 39 percent attribution of EBITDA to new stores, he calculated that 39 percent of LMRV's increase in value, or $41,404,000, was due to its opening of new stores. Yip also made calculations for apportionment of LMRV's increased value under both the *Pereira* and *Van Camp* approaches because it was not within his expertise as a forensic accountant to opine regarding which approach should be used. Rather, that decision was ultimately for the trial court to make. Under the *Pereira* approach, Yip calculated a range of $37,109,000 to $39,122,000 (using simple interest for Husband's separate property interest in LMRV of $8,772,000 on the date of marriage) and, alternatively, a range of $34,078,000 to $37,631,000 (using compound interest for his separate property interest) for

---

4    However, Linebarger later testified that Yip's EBITDA approach focused on gross revenues, and not net cash flow or profits, noting that the new store locations in Florida did not become profitable until 2016.

the community's interest in the increase in LMRV's value.[5]  Under the *Van Camp* approach, Yip calculated the reasonable compensation for Husband's services to LMRV during the marriage and found that the community had been undercompensated by LMRV for his services by $837,000.  On cross-examination, Yip admitted that he had not valued any RV dealerships before and had not performed an independent investigation regarding the economic factors that affected LMRV during the marriage.  He also admitted that he had not spoken with any of LMRV's management team members regarding its expansion philosophy and addition of new stores.  He also admitted that he had not looked into how many hours Husband worked for LMRV or whether he was fulfilling his duties to it during the marriage.  He also admitted that the factors to be considered in valuing LMRV included that it was an asset intensive business and the experience of its management team.

C

*Trial court's decision*

In its statement of decision, the court initially found that Husband had made more than minimal contributions to the increase in LMRV's value during the marriage and therefore apportionment of that increased value between the community and Husband's separate property was required, citing *Brooks*, *supra*, 33 Cal.App.5th at page 592.  The court then stated that it had broad discretion in selecting a formula for apportionment that would achieve substantial justice between the parties.  It noted that Wife argued it should adopt the *Pereira* approach, while Husband argued it should adopt the

---

[5]    Yip also calculated a range of from $14,586,000 to $16,745,000 for the community's interest in LMRV's increased value under an alternative scenario considering Husband's transfers or gifts of LMRV shares to his children during the marriage.

20

*Van Camp* approach.[6]  The court described the two alternative
apportionment approaches, stating:

> "*Pereira* is utilized when post-marriage growth of a
> business is principally attributed to 'the personal activity,
> ability, and capacity of the spouse' (*Beam*, *supra*, [6 Cal.3d
> at p.] 18; *Brandes*, *supra*[,] [239 Cal.App.4th at p.] 1473),
> while *Van Camp* is used when post-marriage growth is due
> primarily to capital investment in the separate property or
> factors other than the spouse's particular efforts (*Beam*,
> *supra*[,] at [p.] 18; *Brandes*, *supra*[,] at [p.] 1473).  When
> efforts of others in the company cause the increase in value
> of the business, *Van Camp* may be the appropriate method
> of apportionment (*Brooks*, *supra*, at [p.] 592; *Brandes*,
> *supra*, at [pp.] 1469-1470)."

Considering the evidence presented at trial, the court found that
Husband was the principal force contributing to LMRV's success during its
early years.  However, it found that during the 2004 to 2009 period, Husband
and Walters expanded LMRV's decisionmaking group to include OConnor,
Upton, Sundstrom, and others.  The court found that an executive committee
"began making the real decisions about the trajectory of the company and
how and why it would expand."  That committee "centralized pricing,
advertising and oversights, which largely contributed to [LMRV's] ultimate
success."  Walters ran the meetings of the executive committee.  The
executive committee unanimously (and not Husband alone) decided to expand
by opening new stores in Arizona, New Mexico, Florida, and California.  That
committee also handled LMRV's day-to-day operations.

The court found that when Husband suffered a serious heart attack in
2009, the executive committee ran LMRV for two years while keeping him

---

6    As the court noted, neither party argued that a hybrid approach should
be applied.  (Cf. *Brandes*, *supra*, 239 Cal.App.4th at p. 1473 [upholding trial
court's application of hybrid approach to circumstances in that case].)

informed. After his return to LMRV at age 70, Husband's involvement in LMRV's daily decisions was more limited and he generally worked 8 to 12 hours per week, unless traveling for business when he worked up to 24 hours per week. The store managers ran their respective stores with able oversight from Walters, Upton, OConnor, and Jason.

Importantly, the court found that "[t]he economy played no small role in the success of [LMRV], as did [its] strong relationships with quality manufacturers (e.g.[,] Winnebago and Tiffin) and with their banks. [Citation.] Following the recession of 2007-2010, the pent[-]up demand for [RVs] from baby boomers resulted in a substantial increase in the sales of product at [LMRV]." During the recession, entities owned by Husband were able to purchase improved real property at reduced prices. On recovery from the recession, LMRV was prepared to open, and opened, new stores in other markets, such as Arizona, New Mexico, and Florida. During the marriage, RV shows, centralized advertising, and other marketing also contributed to LMRV's success.

The court found that although Husband, often along with Wife, frequently traveled to Florida to check on store locations there, "that activity alone, although time-consuming, does not suggest that [he] was the qualitative driver of [LMRV's] success during the years of this marriage." The court selected the *Van Camp* approach as the appropriate method of apportioning the increase in LMRV's value during the marriage between the community and Husband's separate property. The court reasoned:

> "While the founder and 'soul' of the business, [Husband] was not the principal factor accounting for the increasing value of [LMRV] during the period of this marriage (March 2010 to September 2016). . . . [Husband] was recovering from a heart attack and minimally involved in the business for the first year of the marriage and never resumed a real

22

full-time regimen or assumed the principal guiding role in the business thereafter. He, along with others in his management team, and the economy, and the business strategies developed a decade prior to marriage all assisted in making [LMRV] the success it is today."

Applying the *Van Camp* approach, the court found that the community had been undercompensated for Husband's efforts during the marriage by $837,000, finding that Yip's analysis of the community's undercompensation to be more persuasive than Linebarger's analysis. The court then deducted $115,000 for community expenditures for jewelry that Husband purchased for Wife with LMRV funds, resulting in a net undercompensation amount of $722,000. It then found that Wife's share of that amount was $361,000. The court also awarded Husband his interest in LMRV as his separate property.

D

*Section 2555*

In challenging the trial court's findings and apportionment of the increased value of LMRV, Wife initially argues that we should review the court's findings and apportionment de novo under section 2555. That statute provides: "The disposition of the community estate, as provided in this division, is subject to revision on appeal in all particulars, including those which are stated to be in the discretion of the court." (§ 2555.) In support of her argument that we should review this matter de novo, Wife asserts that "the facts are essentially undisputed."

We decline Wife's suggestion that we review de novo the trial court's findings in dividing the parties' community estate, including its decision to apply the *Van Camp* approach in apportioning the increase in LMRV's value during the marriage between the community and Husband's separate property. First, contrary to Wife's assertion, the facts are *not* "essentially undisputed." Instead, the facts were disputed by the parties during the nine-

23

day trial.  In particular, on the issue of whether Husband was the chief contributing factor in LMRV's growth during the marriage, the parties presented conflicting evidence and argued divergent inferences from their evidence.  Given the disputed evidence and inferences on that issue, we conclude the appropriate standards of review are the substantial evidence standard regarding the court's findings of fact and the abuse of discretion standard regarding the court's selection of the appropriate approach for apportionment of LMRV's increased value between the community and Husband's separate property.

Second, Wife's opening appellant's brief does not cite, and we are unaware of, any case in the past 50 years that has applied the section 2555 de novo review standard to a trial court's selection of the *Pereira* or *Van Camp* approach in apportioning the increase in value of a spouse's separate property business during the marriage between the community and that spouse's separate property.[7]  In any event, Wife has not carried her burden

---

[7]    As Husband notes, section 2555's language originated in former statutes that predated California's adoption of its statutory scheme of "no-fault" divorce and equal division of community property.  (See, e.g., former Civ. Code, § 146; *Falk v. Falk* (1941) 48 Cal.App.2d 762, 770-771.)  As he further notes, there appears to be only one recent case that has applied the section 2555 standard of review.  In *In re Marriage of Mohler* (2020) 47 Cal.App.5th 788, the appellate court concluded that the trial court erred by applying an incorrect legal standard in awarding the community an increased interest in a spouse's separate property for his postseparation possession of, and mortgage payments made for, that separate property.  (*Id.* at pp. 790-791.)  Citing its authority under section 2555, the court vacated that award and remanded the matter for the trial court to calculate the community's and the spouse's separate property interests under the correct legal standard.  (*Mohler*, at pp. 797-798.)  Because *Mohler* is factually and procedurally inapposite to this case and appears to be exceptional in its reliance on section 2555, it does not persuade us to apply the section 2555 de novo standard in reviewing the trial court's selection of the *Van Camp*

24

on appeal to persuade us that we should apply the section 2555 de novo standard in lieu of the established substantial evidence and abuse of discretion standards that appellate courts have consistently applied in reviewing such determinations by trial courts.  (See, e.g., *Brooks*, *supra*, 33 Cal.App.5th at pp. 588, 593; *Brandes*, *supra*, 239 Cal.App.4th at pp. 1472-1473; *Dekker*, *supra*, 17 Cal.App.4th at p. 849.)

E

*Analysis*

In reviewing the trial court's exercise of its discretion and selection of the *Van Camp* approach to apportion LMRV's increased value during the marriage between the community and Husband's separate property, we apply the abuse of discretion standard and, in reviewing its underlying factual findings related thereto, we apply the substantial evidence standard.  (See, e.g., *Brooks*, *supra*, 33 Cal.App.5th at pp. 588, 593; *Brandes*, *supra*, 239 Cal.App.4th at pp. 1472-1473; *Dekker*, *supra*, 17 Cal.App.4th at p. 849.) Here, the trial court made a number of factual findings before selecting the *Van Camp* approach.  First, the court found that from 2004 to 2009, Husband and Walters expanded LMRV's decisionmaking group to more than seven members, referring to it as LMRV's executive committee.  The court found that committee, which was run by Walters and not Husband, made the "real decisions" regarding LMRV's trajectory and expansion, centralized its pricing, advertising and oversights, and handled LMRV's day-to-day operations, all of which largely contributed to LMRV's ultimate success. There is substantial evidence to support those findings by the court.  In particular, as discussed above, Walters, Upton, OConnor, Sundstrom, and

---

approach in apportioning LMRV's increased value during the marriage between the community and Husband's separate property.

Jason testified regarding their various job duties and those of other LMRV employees and described LMRV's management approach and practices. Members of LMRV's management team would make their recommendations in their areas of expertise regarding day-to-day operations and major business decisions and then the management team would collectively discuss those recommendations and decide whether it agreed or not. During the parties' marriage, Husband was not involved in decisions on LMRV's day-to-day operations and, with just one exception, never exercised his veto power during the marriage to reject a major business decision made by the management team.

Second, the court found that when Husband suffered a serious heart attack in 2009, the executive committee ran LMRV for two years and, even after his return to work, his involvement in LMRV's daily decisions was more limited and he generally worked only 8 to 12 hours per week. There is substantial evidence to support those findings. In particular, OConnor, Walters, and Upton testified regarding Husband's absence from LMRV during his recovery from heart surgery and his limited involvement in its management and business thereafter.

Third, the court found that the economy "played no small role" in LMRV's growth during the marriage, noting that during the economic recovery that followed the recession of 2007 through 2010, there was pent-up demand for RVs that resulted in a substantial increase in LMRV's sales. There is substantial evidence to support that finding. Walters and OConnor testified that the RV industry was historically cyclical in nature and there was a correlation between the health of the economy and the number of RVs sold by LMRV. In particular, Walters testified that the biggest factor in LMRV's growth was its taking advantage of a strong economy. Walters and

OConnor testified that during the great recession, LMRV, along with the entire RV industry, experienced precipitous drops in RV sales because RVs are not necessities. In particular, beginning in 2010 after the great recession, there was pent-up demand for RVs and LMRV's sales increased dramatically as "baby boomers" experienced growth in their wealth and purchased RVs with historically low interest rate loans. OConnor and Jason testified that the entire RV industry, and not just LMRV, experienced "meteoric" growth in RV sales during that economic recovery. Because of that industry-wide growth, Upton testified that he could not give Husband credit for LMRV's growth during that period of economic recovery. Likewise, Linebarger, Husband's expert witness, testified that the national economic environment was "really impactful" on LMRV's value, that RV sales were related to discretionary income, and, when unemployment rates decreased, RV sales increased. When the national GNP grew, sales in the RV industry as a whole, as well as LMRV's sales, also grew. Also, the local economies in which LMRV had store locations followed the national trends. Linebarger testified that because LMRV's sales followed the general trends of the RV industry, its value was not tied to one specific person (e.g., Husband) or what was happening inside the company.

Finally, the court found that LMRV's relationships with quality manufacturers and its banks also played roles in LMRV's success during the marriage. There is substantial evidence to support that finding. In particular, Linebarger testified that before the marriage LMRV had strong relationships with manufacturers, including with two of the top RV manufacturers, which relationships were not dependent on Husband and gave LMRV a competitive advantage in its markets. OConnor testified that Walters and Upton, and not Husband, primarily handled LMRV's

27

relationships with manufacturers. Likewise, Linebarger testified that LMRV's relationships with banks were dependent on OConnor, not Husband. OConnor testified that his strong relationships with banks enabled LMRV to survive the great recession.

Relying on the evidence discussed above, as well as other evidence admitted at trial, and its underlying factual findings discussed above, the trial court made its ultimate factual finding that Husband "was *not* the principal factor accounting for" the increase in LMRV's value during the marriage. (Italics added.) The court expressly rejected Wife's argument that Husband's frequent travel to Florida to check on store locations suggested that he was the qualitative driver of LMRV's success during the marriage. We conclude substantial evidence supports its ultimate finding of fact that Husband was not the principal factor accounting for LMRV's increased value during the marriage.

Based on the evidence and its underlying factual findings, the court exercised its discretion and selected the *Van Camp* approach as the appropriate method to apportion the increase in LMRV's value during the marriage between the community and Husband's separate property. In so doing, the court implicitly, if not expressly, found that under applicable case law, LMRV's growth in value during the marriage was due primarily to Husband's separate property capital investment in LMRV and factors other than his personal efforts during the marriage, such as the growth of the national economy and the efforts of LMRV's executive committee and other management team members. The court implicitly found that the character of Husband's separate property capital investment in LMRV, and *not* his personal activity, ability, and capacity, was the chief contributing factor in LMRV's realization of income and profits during the marriage. (*Beam*, *supra*,

6 Cal.3d at p. 18.) Accordingly, the court selected the *Van Camp* approach to apportion LMRV's increased value between the community and Husband's separate property.

We conclude that the trial court did not abuse its discretion by selecting the *Van Camp* approach, instead of the *Pereira* approach, to apportion LMRV's increased value between the community and Husband's separate property. As discussed above, there is substantial evidence to support the court's underlying factual findings and, in particular, its ultimate finding that factors other than Husband's efforts were the primary causes of LMRV's growth during the marriage, such as the growth in the national economy and management of LMRV by an established executive committee. We conclude that the court, based on those findings, acted within its discretion in selecting the *Van Camp* approach. (Cf. *Somps v. Somps* (1967) 250 Cal.App.2d 328, 334 [*Van Camp* approach properly applied by trial court where increased value of single-family residence engineering business resulted from increased demand due to unprecedented growth in local population and not from spouse's efforts]; *Tassi v. Tassi* (1958) 160 Cal.App.2d 680, 690-692 [*Van Camp* approach properly applied by trial court where increased value of meat business was chiefly attributable to high profits that resulted from increased demand and sales after termination of meat rationing after World War II]; *Gilmore v. Gilmore* (1955) 45 Cal.2d 142, 150 (*Gilmore*) [*Van Camp* approach properly applied by trial court in apportioning increased value of automobile dealerships where there was tremendous increase in automobile industry sales and well-trained employees managed the businesses without assistance of spouse]; *Harrold v. Harrold* (1954) 43 Cal.2d 77, 80 (*Harrold*) [*Van Camp* approach properly applied by trial court where increased value of automobile

dealership was due in large part to efforts of competent administrative employees and not spouse's efforts].)

As discussed above, a court is not bound by any precise criterion or standards in selecting an apportionment approach and, in so doing, may select whichever approach or formula that will achieve substantial justice between the parties. (*Beam*, *supra*, 6 Cal.3d at p. 18.) Based on our review of the record on appeal, we conclude that the trial court acted rationally and reasonably in selecting the *Van Camp* approach as most appropriate and equitable approach to apportion LMRV's increased value during the marriage between the community and Husband's separate property in the particular circumstances of this case. (*Ibid*.; *Brooks*, *supra*, 33 Cal.App.5th at p. 588; *Brandes*, *supra*, 239 Cal.App.4th at p. 1473; *Dekker*, *supra*, 17 Cal.App.4th at p. 849.) Alternatively stated, we conclude that the trial court did not act outside the permissible range of options set by the relevant legal criteria. (*Brandes*, at pp. 1473-1474.)

F

*Wife's cited evidence*

In support of her argument that the trial court abused its discretion by selecting the *Van Camp* approach to apportion LMRV's increased value between the community and Husband's separate property, Wife primarily cites evidence and inferences therefrom that would have supported a contrary finding by the court (i.e., that Husband's efforts were the primary cause of LMRV's increased value during the marriage). However, in so doing, she misconstrues and/or misapplies the applicable standards of review.

Preliminarily, we note that, as discussed above, we decline Wife's suggestion that we should review the trial court's selection of the *Van Camp* approach de novo under section 2555. Rather, also as discussed above, we

apply the substantial evidence standard in reviewing the trial court's factual findings and the abuse of discretion standard in reviewing its ultimate decision to select the *Van Camp* approach to apportion LMRV's increased value between the community and Husband's separate property. (See, e.g., *Brooks*, *supra*, 33 Cal.App.5th at pp. 588, 593; *Brandes*, *supra*, 239 Cal.App.4th at pp. 1472-1473; *Dekker*, *supra*, 17 Cal.App.4th at p. 849.) In so doing, we defer to the trial court's weighing of the evidence, including its determinations regarding the credibility of witnesses. In applying the substantial evidence standard of review, we accept all evidence supporting the trial court's judgment or finding, completely disregard contrary evidence, and draw all reasonable inferences from the evidence to support the judgment or finding. (*Schmidt*, *supra*, 44 Cal.App.5th at pp. 581-582.) It is our function to determine only if substantial evidence supports the trial court's judgment or finding and *not* whether there may be substantial evidence to have supported a contrary judgment or finding (e.g., in favor of Wife). (*Id*. at p. 582.) At a bench trial such as in this case, the trial court is the sole judge of witness credibility and may disregard the testimony, contradicted or uncontradicted, of any witness if there is any rational ground for doing so. (*Ibid*.) We cannot reweigh the evidence, substitute our own inferences from the evidence, or make different assessments of credibility from the trial court's assessments. (*Ibid*.; *Ana C.*, *supra*, 204 Cal.App.4th at p. 1329.) An appeal is not a "retrial" of the case or an opportunity for an appellant to rehash arguments about the strength of the evidence. (*Paterno*, *supra*, 74 Cal.App.4th at p. 102.) We defer to the trial court's determination of credibility or other factual issues because it had the benefit of observing the demeanor of witnesses and was therefore in a better position than an

31

appellate court to assess credibility. (*Boswell*, *supra*, 225 Cal.App.4th at p. 1175.)

Although Wife cites certain testimony and other evidence that could have supported an inference that Husband was primarily responsible for LMRV's expansion of store locations in Florida, Arizona, and New Mexico during the marriage, she omits or minimizes other testimony and evidence, as discussed above, that supported Linebarger's and the trial court's conclusions that LMRV's expansion of store locations was primarily the result of established business practices and the efforts of other members of LMRV's management team and not Husband's efforts. Furthermore, she argues that the trial court erred by not accepting Yip's opinion that Husband was the primary reason for LMRV's expansion of store locations and thus its increased gross income and increased value and by instead accepting Linebarger's contrary opinion. Wife also argues that "[s]everal factors point towards Husband as the 'chief contributing factor' in [LMRV's] increase in value," citing evidence that arguably would support inferences that Husband had "control" of LMRV, made all of its store expansion and other business decisions, and personally guaranteed many of its loans. Based on that evidence and inferences favorable to *her* position, Wife argues "[t]he community was the main contributing factor to the success of [LMRV] during the marriage."

However, by so arguing, Wife misapplies the substantial evidence standard of review. She, in effect, seeks to "retry" the case and have us reweigh the evidence and make credibility determinations. As discussed above, that is *not* the function of an appellate court in determining whether there is substantial evidence to support the factual findings of a trial court. Rather, we view the evidence, and make inferences therefrom, favorably to

32

support the trial court's factual findings and, in so doing, defer to the trial court's weighing of the evidence and credibility determinations. (*Schmidt*, *supra*, 44 Cal.App.5th at pp. 581-582; *Ana C.*, *supra*, 204 Cal.App.4th at p. 1329.)

Likewise, Wife misapplies the substantial evidence standard that we apply in reviewing the trial court's finding that LMRV's increased value was primarily attributable to factors other than Husband's efforts. In particular, Wife cites evidence showing Husband's efforts in finding, opening, and fostering new store locations in Florida, which efforts she argues were the actual primary cause of LMRV's increased value. Citing evidence that LMRV's gross sales from the new Florida store locations constituted about one-half of its revenues, Wife argues that Husband's efforts regarding those new stores necessarily were the primary cause of LMRV's increased value during the marriage. In so doing, she cites only evidence and inferences favorable to her position and minimizes, if not wholly omits discussion of, evidence and inferences favorable to the trial court's contrary finding. By so doing, she has not carried her burden on appeal to show that substantial evidence does not support the trial court's finding that LMRV's increased value was primarily attributable to factors other than Husband's efforts or, for that matter, that the court abused its discretion in selecting the *Van Camp* approach to apportion that increased value between the community and Husband's separate property.

To the extent Wife argues that the trial court should have exercised its discretion and selected the *Pereira* approach because Husband "controlled" LMRV and its decisions, she misconstrues the correct test for selecting the *Pereira* approach, improperly conflating "control" over LMRV and its business decisions with the question of whether Husband's personal efforts were the

33

"chief contributing factor" for its increased value (*Logan v. Forster* (1952) 114 Cal.App.2d 587, 599 (*Logan*)) or, alternatively stated, whether its increased value was "principally attribut[able] to" his efforts (*Dekker*, *supra*, 17 Cal.App.4th at p. 853). Husband's "control" of LMRV, whether by means of his majority ownership position or the authority implicit with his executive title (i.e., chief executive officer), does not, by itself, meet that standard and does not show the *Van Camp* approach could not rationally be selected by the trial court within its discretion based on other factors (as the trial court did in this case). (Cf. *Gilmore, supra*, 45 Cal.2d at p. 150 [*Van Camp* approach applied where spouse owned automobile dealerships]; *Logan, supra*, 114 Cal.App.2d at pp. 600-601 [*Van Camp* approach applied where spouse wholly owned utility company]; *Harrold, supra*, 43 Cal.2d at pp. 80-81.) She also ignores contrary evidence discussed above, which showed that LMRV's management team made all of its important business decisions and, although Husband could veto those decisions, he apparently vetoed only one such decision by the management team. Therefore, contrary to Wife's assertion that the evidence at trial showed Husband "made all important decisions" for LMRV's business, the trial court could instead reasonably infer that Husband effectively deferred to LMRV's management team and its decisions and did not actively control or make those decisions himself. Accordingly, we conclude that Wife has not carried her burden on appeal to show the trial court abused its discretion by selecting the *Van Camp* approach to apportion LMRV's increased value between the community and Husband's separate property.

## III

### *$115,000 Deduction for Jewelry Purchase*

Wife contends that the trial court erred by deducting $115,000 from the community's interest in LMRV for jewelry (i.e., diamond earrings) purchased by Husband with community funds from LMRV apparently in excess of his draw account balance and then given to her. In her opening appellant's brief, Wife argues in a conclusory manner that because, as discussed above, we should reverse the trial court's selection of the *Van Camp* approach and instead apply the *Pereira* approach to apportion LMRV's increased value between the community and Husband's separate property, we must also reverse its $115,000 jewelry purchase deduction from the amount of the community's undercompensation as improper under the *Pereira* approach. Wife argues: "Undercompensation is only relevant if the *Van Camp* method of calculating Wife's share of the business profits is used. Since the *Pereira* method should be used, there is no reason for any deduction."

However, because we concluded above that the trial court properly selected and applied the *Van Camp* approach, the premise of Wife's argument is ill-founded and therefore we conclude she has not carried her burden on appeal to show the court erred by deducting $115,000 from the $837,000 gross amount of undercompensation to the community for the jewelry purchased by Husband with community funds from LMRV and then given to her. In any event, we conclude that substantial evidence supports the trial court's deduction of $115,000 from the $837,000 gross amount of undercompensation for Husband's services to LMRV during the marriage, which resulted in the net amount of undercompensation of $722,000.

The parties do not dispute on appeal that under the *Van Camp* approach the trial court correctly found that the community was

35

undercompensated by LMRV for Husband's services during the marriage in the gross amount of $837,000. They also do not dispute that the funds for Husband's $115,000 purchase of jewelry came from LMRV. At trial, Husband testified that in January 2011 he called Sundstrom and directed her to wire funds from LMRV directly to the seller of the jewelry. He then gave the jewelry (i.e., diamond earrings) to Wife with the intent that she wear them. In the absence of evidence showing otherwise, it is presumed that community expenses are paid from community funds rather than separate funds. (*Beam*, *supra*, 6 Cal.3d at p. 20, citing *Estate of Neilson* (1962) 57 Cal.2d 733, 742.) Here, absent evidence or findings showing otherwise (and the parties do not cite any contrary evidence or findings), we conclude that the trial court implicitly found that the $115,000 purchase of jewelry by Husband constituted community expenses, which purchase was presumably paid for from community funds rather than his separate funds. (Cf. *Beam*, at p. 21.) We further conclude that the court implicitly found that the $115,000 jewelry purchased by Husband during the marriage was presumptively community property under section 760. The court then expressly found in its statement of decision that the $115,000 diamond earrings and other jewelry items given by Husband to Wife were her separate property and awarded them to her as her separate property. In so doing, the court found that "[a]lthough expensive and numerous," the jewelry items given by Husband to Wife were "gifts of a personal nature" and not "outside the standard of living of the parties," thereby implicitly finding that the jewelry items were effectively transmuted from community property to her separate property pursuant to section 852, subdivision (c). (Cf. *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1401-1402 [hypothetical purchase of "particularly expensive" jewelry by husband that was substantial in value taking into account the

36

circumstances of the marriage was community property and there would be no transmutation from community property to wife's separate property on his gift of jewelry to her under § 852, subd. (c), absent express written declaration effecting transmutation under § 852, subd. (a)].)

Assuming arguendo the trial court had instead found that the LMRV funds used to purchase the $115,000 diamond earrings were Husband's separate property and had not come from community income and then found (correctly or incorrectly) that he was entitled to reimbursement, we presume the court would not have deducted that $115,000 amount from the $837,000 gross amount of undercompensation to the community, but instead awarded the entire $837,000 amount to the community as undercompensation (which would then be divided equally between the parties) and then separately awarded Husband reimbursement for the $115,000 payment made from his separate property. However, because the court did not do so, we infer that the court impliedly found that the $115,000 amount paid from LMRV was instead from community income and therefore that amount should be deducted from the $837,000 gross amount of undercompensation to the community, resulting in the $722,000 net amount of undercompensation found by the court to be divided equally between the parties. Based on our review of the record, we conclude that substantial evidence supports the court's finding and its $115,000 deduction from the $837,000 gross amount of undercompensation, resulting in a net amount of undercompensation to the community of $722,000 under the *Van Camp* approach.

## IV

### *The Property*

Wife contends that the trial court erred by implicitly finding the source of the initial $4,700,000 in funds from LMRV to purchase the Property (i.e.,

the Del Mar home) was Husband's separate property, not finding the second LMRV note and trust deed were invalid for lack of consideration, and finding Husband did not breach his fiduciary duties to her in arranging the first and second LMRV loans and using the proceeds of the Citibank loan to pay down the LMRV loan.

A

In February 2016, the parties purchased the Property for about $6.3 million. That purchase price was primarily paid with down payments of $642,999 by Husband and $550,000 by Wife and a $4.7 million transfer of funds from LMRV arranged by Husband.[8] Husband's down payment came from Velocity Properties, LLC, a company that was his separate property. Wife's down payment(s) came from her individual account that she maintained with LMRV. On or about February 1, the parties signed and delivered to LMRV an unsecured promissory note in the principal amount of $4.7 million that was payable on demand. In April, the parties obtained a $2 million loan from Citibank, which was secured by a first trust deed on the Property, and the proceeds were used to pay down the balance of the $4.7 million loan from LMRV. In May, the parties signed a second promissory note in the face amount of $4.7 million payable to LMRV, which note had a two-year term and was secured by a second trust deed on the Property.

---

[8]    Those payments constitute only $5,892,999 of the $6.3 million total purchase price. However, neither party cites evidence nor otherwise describes the source of payment for the remainder of the $6.3 million purchase price. Given the extensive record on appeal that exceeds 20,000 pages, we decline to independently review the record to locate evidence showing the payment source for the remainder of the purchase price. In any event, for purposes of addressing the contentions on appeal, we conclude that source of payment does not appear to be relevant.

In its statement of decision, the trial court found that the first unsecured LMRV promissory note was replaced by the second secured LMRV promissory note. It also found that the proceeds of the $2 million Citibank loan were used to pay down the balance of the parties' LMRV loan, resulting in a then-current outstanding LMRV loan balance of $2,838,145.66. The court rejected Wife's claim that she did not know what she was signing when she signed the LMRV and Citibank notes and loan documents, noting she was intelligent and a former real estate agent. It also found that Wife had not been defrauded, misled, or taken advantage of in signing the loan documents. The court also rejected her claim that Husband breached his fiduciary duties by misleading her regarding the financing for the Property. The court found that the Property was community property, the LMRV and Citibank loans were community debts, and the parties owed Citibank $2 million, plus interest, and LMRV $2,838,145.66, plus interest. The court ordered that the Property be sold and that the net sale proceeds (after payment of the costs of sale, payment of the LMRV and Citibank loan balances, and deductions for section 2640 reimbursement awards to the parties) be divided equally between the parties. Addressing the parties' respective section 2640 reimbursement claims, the court awarded Husband $642,993 for his separate property used to purchase the Property and awarded Wife $550,000 for her separate property used to purchase the Property.

B

Wife argues that the trial court erred by implicitly finding that Husband's separate property interest in LMRV was not commingled with her separate property or the community's interest in LMRV. Based on that error, she argues the court further erred by finding that the $4.7 million loan

39

proceeds from LMRV came from Husband's separate property interest in it, rather than their community property, and/or by denying her request that the LMRV note and trust deed be set aside. In particular, Wife argues that the evidence showed Husband's and her accounts with LMRV had been commingled with his LMRV salary (a community interest) and therefore the community's interest was commingled with his separate interest in LMRV, thereby supporting only a finding that the $4.7 million in LMRV funds were community property. She also argues that because the evidence showed she received no consideration for signing the second LMRV note and trust deed and Husband breached his fiduciary duty to her, the court was required to set aside the second LMRV note and trust deed as invalid and then divide the $4.7 million in LMRV funds between them (presumably upon the court-ordered sale of the Property). She appears to alternatively argue that the court also should have found that the $2 million in Citibank loan proceeds were also community property, which funds should have been divided between them, rather than used to pay down the balance of the $4.7 million LMRV loan.

As Wife notes, to the extent a spouse's separate property funds are commingled with community property, those separate property funds are presumed to be community property unless the spouse rebuts that presumption with documentary evidence tracing the funds to the spouse's separate property. (See, e.g., *See v. See* (1966) 64 Cal.2d 778, 784 (*See*); *Estate of Murphy* (1976) 15 Cal.3d 907, 919 (*Murphy*); *In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 274 (*McLain*); *In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 822-823 (*Braud*) ["the mere commingling of separate property and community property funds does not alter the status of the respective property interests, provided that the components of the

40

commingled mass can be adequately traced to their separate property and community property sources"].) "Where funds are paid from a commingled account, the presumption is that the funds are community funds." (*In re Marriage of Frick* (1986) 181 Cal.App.3d 997, 1010 (*Frick*).) On appeal, we review a trial court's finding of fact regarding whether a spouse has adequately traced funds to a separate property source for substantial evidence. (*Braud*, at p. 823.) If substantial evidence supports that factual finding, we must uphold it "even though evidence conflicts or supports contrary inferences." (*In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179, 1185 (*Grinius*), citing *Beam*, *supra*, 6 Cal.3d at p. 25; see also, *Schmidt*, *supra*, 44 Cal.App.5th at p. 582.)

Husband asserts that Wife did not raise these arguments below and thereby forfeited any claim that the $4.7 million LMRV loan proceeds or the $2 million Citibank loan proceeds were community property and not his separate property. Assuming arguendo that Wife did not forfeit these arguments by not raising them below, we nevertheless conclude she has waived or forfeited her arguments on appeal and/or not carried her burden on appeal to show that substantial evidence does not support the trial court's implied and express findings regarding the LMRV and Citibank loans, her receipt of consideration, and Husband's compliance with his fiduciary duties to her.[9]

Initially, we note that rather than properly citing the evidence and inferences favorable to the court's findings and decision, Wife cites only evidence and inferences favorable to her position and, in so doing,

_____

[9]    In her trial brief, Wife argued, among other things, that the $4.7 million in funds transferred by LMRV to escrow were community funds. Accordingly, it does not appear on this record that Wife clearly forfeited her arguments below as Husband asserts.

misconstrues and/or misapplies the substantial evidence standard of review. As stated above, in applying the substantial evidence standard of review, we accept all evidence supporting the trial court's judgment or finding, completely disregard contrary evidence, and draw all reasonable inferences from the evidence to support the judgment or finding. (*Schmidt*, *supra*, 44 Cal.App.5th at pp. 581-582.) We determine only "if substantial evidence exists to support [the judgment or finding] in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events." (*Id.* at p. 582.) We cannot reweigh the evidence, substitute our own inferences from the evidence, or make different assessments of credibility from the trial court's assessments. (*Ibid.*; *Ana C.*, *supra*, 204 Cal.App.4th at p. 1329.) An appeal is not a "retrial" of the case or an opportunity for an appellant to rehash arguments about the strength of the evidence. (*Paterno*, *supra*, 74 Cal.App.4th at p. 102.)

By disregarding or misapplying the substantial evidence standard of review, we conclude that Wife has waived or forfeited her contentions or has, in effect, conceded her contentions lack merit. As discussed above, an appellant's contentions should be tailored to the applicable standard of appellate review and a failure to acknowledge or apply the proper scope of review may be considered to be a concession of a lack of merit of that contention. (*Sonic Manufacturing Technologies, Inc.*, *supra*, 196 Cal.App.4th at p. 465.) Alternatively stated, by citing only evidence favorable to her position and ignoring evidence supporting the court's judgment or findings, Wife waived or forfeited her substantial evidence contention and we therefore presume the record contains evidence to support the trial court's factual findings. (*Delta Stewardship Council Cases*, *supra*, 48 Cal.App.5th at

42

p. 1072; *Doe v. Roman Catholic Archbishop of Cashel & Emly*, *supra*, 177 Cal.App.4th at p. 218.)

Nevertheless, assuming arguendo that Wife has not waived or forfeited her contentions, we conclude she has not carried her burden on appeal to show that substantial evidence does not support the trial court's implicit and express findings that she challenges. Rather than properly citing evidence and inferences that support the court's findings, Wife cites only certain evidence that purportedly supports her arguments. Even so, as Husband argues, the evidence cited in her appellant's opening brief does not support the findings she argues the court should have made. First, in support of her commingling argument, Wife cites to the reporter's transcript (i.e., 2 RT 674-676) where Husband purportedly testified that he was able to convert his expenses incurred for her travel with him on business trips from reimbursed business expenses instead to draws on his salary by simply notifying LMRV's controller. However, our review of the testimony set forth on that excerpt from the reporter's transcript does not support her position. In those three pages from Husband's trial testimony, he admitted that in his deposition he stated that Wife traveled with him on business trips and LMRV paid for her travel with him on business. He then admitted that he had subsequently corrected his deposition testimony to state, instead, that the expenses for Wife's travel with him were charged to his credit card, which LMRV paid and then charged to his LMRV draw account. That testimony by Husband does not support Wife's assertion that he converted her travel expenses from business expenses reimbursed by LMRV to draws on his LMRV draw account by simply notifying its controller, nor does it show Husband's separate interest in LMRV was commingled with the community's interest in LMRV (e.g., Husband's draw account).

43

Second, Wife cites to the reporter's transcript (i.e., 2 RT 632) where Husband purportedly testified that he was able to convert advances from LMRV to loans from LMRV, which he could pay back or not as he so chose. However, our review of Husband's testimony set forth on that excerpt from the reporter's transcript does not support her position. On that cited page from the reporter's transcript, Husband testified that when he took a draw from LMRV, he considered it to be an advance on his salary (i.e., "[i]t's an advance on salary or whatever, to pay it back"). That testimony by Husband does not support Wife's assertion that he was able to convert advances from LMRV to loans from LMRV, which he could pay back or not as he so chose, nor does it show Husband's separate interest in LMRV was commingled with the community's interest in LMRV (e.g., Husband's draw account).

Third, and finally, Wife cites to the appellant's appendix (i.e., 6 AA 3290) where there is evidence that purportedly showed that her funds were commingled with LMRV funds. However, as Husband argues, that excerpt from the record is from OConnor's deposition testimony, which does not appear to have been admitted in evidence at trial, and Wife does not show otherwise. (See, e.g., 1 AA 409, 693, 699; 5 AA 3253; 2 RT 373-374, 489.) In any event, on that cited page from OConnor's deposition testimony, he testified only that when LMRV acquired properties for new store locations, LMRV did not use any of the funds Wife maintained in her account with it ("[t]hat wouldn't have happened") and elaborated that there was no need for her money to do so even if her funds were "commingled" (presumably, with Husband's separate funds or the community's interest), noting LMRV had "plenty of capital" to acquire those properties on its own. That deposition testimony by OConnor does not support Wife's assertion that her funds were

44

commingled with LMRV funds, nor does it show Husband's separate interest in LMRV was commingled with the community's interest in LMRV.[10]

Therefore, considering Wife's cited evidence and inferences therefrom favorably to support the trial court's findings and decision, we conclude that she has not carried her burden on appeal to show that substantial evidence does not support its findings and decision relating to the nature and sources of payments made toward the Property's purchase price and the LMRV and Citibank loans and trust deeds.

C

Wife also argues, in a conclusory manner consuming only one-half of a page in her appellant's opening brief, that she received no consideration for signing the second LMRV promissory note and related trust deed. Citing to OConnor's trial testimony (i.e., 2 RT 434), Wife argues that "[t]he evidence is . . . conclusive that [she] received nothing for her execution of [the second LMRV] note and trust deed to effectively convert the community property into Husband's separate property." However, OConnor's testimony does not support Wife's argument. Rather, in the cited page, OConnor testified that he stated at his deposition it was his opinion that the first LMRV promissory note was unsecured by the Property and that the second LMRV promissory note was intended to substitute for the first LMRV promissory note. OConnor then testified that he was not aware of any "financial

_____

10      Although Wife's appellant's opening brief also includes other citations to the record on appeal in support of her description of the chronology of the Property purchase and the documentation for the LMRV and Citibank loans, none of that evidence directly relates to her commingling argument, nor does it show that her separate property or the community's interest in LMRV was commingled with Husband's separate property interest in LMRV such that the $4.7 million loan from LMRV must be deemed to have come from the community's interest.

compensation" that Wife received for signing the second LMRV promissory note that was secured by the Property. That testimony by OConnor does *not*, as Wife asserts, conclusively show that she did not receive any consideration for signing the second LMRV promissory note and trust deed. Instead, it merely constitutes one percipient witness's unawareness of any "financial compensation" that Wife may have received in signing those loan documents.

As Wife notes, "sufficient cause or consideration" is an essential element for a contract. (Civ. Code, § 1550(4).) However, "consideration" under the law need not be direct "financial compensation," as Wife apparently asserts. Civil Code section 1605 provides: "*Any benefit conferred*, or agreed to be conferred, *upon the promisor*, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, *is a good consideration* for a promise." (Italics added.) Furthermore, "[a] written instrument is presumptive evidence of a consideration." (Civ. Code, § 1614.) In her request below to have the second LMRV promissory note and trust deed invalidated, Wife had the burden to show "a want of consideration sufficient to support" them. (Civ. Code, § 1615.) Courts do not weigh the amount of consideration for a contract. (*Rice v. Brown* (1953) 120 Cal.App.2d 578, 582.) "The slightest consideration is sufficient to support" a contract. (*Ibid*.)

On appeal, Wife does not challenge the trial court's finding that the second secured LMRV promissory note replaced the first unsecured LMRV promissory note. As discussed above, OConnor testified that the second LMRV note was a substitute for the first LMRV note. To find sufficient consideration to support the second LMRV promissory note and trust deed,

46

the trial court did not need to look any further than the face of the two LMRV promissory notes and the trust deed. Specifically, because the court expressly found that the second LMRV promissory note replaced the first promissory note, it presumably considered the fact that Husband and Wife were thereby relieved of their liability under the first promissory note. The court also presumably considered the fact that the first promissory note was payable on demand, whereas the second promissory note was not payable on demand, having instead an express term of two years. That evidence, in itself, provided substantial evidence to support the court's implied finding that Wife received adequate consideration for her signing the second LMRV promissory note and trust deed. In particular, in exchange for signing the second LMRV promissory note and trust deed, Wife was relieved of her liability to pay the balance of the first $4.7 million LMRV promissory note and received the benefit of a fixed, longer term (i.e., two-year term rather than payable on demand). Accordingly, we conclude that Wife has not carried her burden on appeal to show that substantial evidence does not support the court's implied finding that she received adequate consideration for signing the second LMRV promissory note and trust deed. Therefore, we reject her contention that the court erred by denying her request to invalidate and set aside the second LMRV promissory note and trust deed for lack of consideration.

D

Wife also argues, again in a conclusory manner consuming only slightly more than one-half of a page in her appellant's opening brief, that the trial court erred by finding that Husband did not breach his fiduciary duties to her (presumably in arranging the first and second LMRV loans and using the proceeds of the Citibank loan to pay down the LMRV loan balance). In so

47

arguing, Wife does not discuss the evidence and inferences therefrom favorably to support the court's finding, but simply asserts in a conclusory manner: "Since the Husband's position here is that the property transferred was his separate property, and there is no adequate evidence that this was true, the transfer of presumptively community property must be invalidated." We conclude that, by arguing in a conclusory manner without discussion of the evidence and inferences favorable to the court's finding, Wife has waived or forfeited her contention on appeal. (*Stanley*, *supra*, 10 Cal.4th at p. 793; *Salas*, *supra*, 198 Cal.App.4th at p. 1074.)

Furthermore, because Wife's appellant's opening brief omits any discussion of the evidence supporting the court's finding that Husband did not breach his fiduciary duties to her, we conclude Wife has waived or forfeited her substantial evidence challenge to that finding and presume the record contains evidence to support that finding. (*Delta Stewardship Council Cases*, *supra*, 48 Cal.App.5th at p. 1072; *Doe v. Roman Catholic Archbishop of Cashel & Emly*, *supra*, 177 Cal.App.4th at p. 218.) Likewise, Wife has waived or forfeited her contention by making only a conclusory assertion and failing to provide adequate legal authority and analysis on the issue. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*); *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852; *Blizzard Energy, Inc. v. Schaefers* (2021) 71 Cal.App.5th 832, 854 [argument, which was set forth in single paragraph of appellant's opening brief, was forfeited because it was not supported by meaningful analysis with citation to authority].) It is not our role as an appellate court to develop appellant's legal arguments and independently review the record on appeal for evidence to support those arguments. (*Stanley*, *supra*, 10 Cal.4th at p. 793; *Cahill*, at p. 956.) Although Wife presents additional argument on this issue in her appellant's

reply brief, that belated argument does not cure or save her earlier waiver or forfeiture of her contention based on her deficient argument in her appellant's opening brief. (Cf. *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4 [points raised in reply brief for first time will generally not be considered]; *High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 111, fn. 2 [obvious considerations of fairness to respondent demand that appellant present all arguments in opening brief]; *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 573, fn. 18 [appellant cannot salvage forfeited argument by belatedly addressing it in reply brief]; *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685 [same].)

E

On November 1, 2021, Husband filed a request that we take judicial notice of a post-judgment stipulation and grant deed on the ground that it might render moot, or constitute a waiver of, certain contentions made by Wife. In particular, Husband requests that we take judicial notice of a "Stipulation and Order Re: Modification of Judgment" (Stipulation), which was signed by the parties and entered by the trial court on November 25, 2020, three weeks after the judgment was entered in this case. The Stipulation provided, among other things, that Husband was required to pay Wife $600,000 for her interest in the Property and thereafter "[n]o further equalizing payment, credit, or offset shall be due to [her] relative to her interest, any reimbursement, offset, or credit relative to the [Property]." The Property would then be awarded to Husband as his sole and separate property, along with all related encumbrances or obligations. The Stipulation further provided that Husband would indemnify Wife and hold her harmless from any and all obligations regarding any financing agreement related to

49

the Property, including any note or trust deed in favor of LMRV or Citibank. The Stipulation also provided that it "extinguishes [Wife's] rights and obligations under the Judgment to the [Property]," but "does not extinguish any other rights under the Judgment." To effect the transfer of her interest in the Property, it also provided that Wife would sign all necessary documents, including an interspousal transfer deed.

Husband also requests that we take judicial notice of an interspousal transfer grant deed (Deed), which was signed by Husband and Wife and recorded with the San Diego County Recorder on January 25, 2021. The Deed provides, among other things, that Husband and Wife granted the Property to Husband, as trustee of his family trust.

In his respondent's brief, Husband argues that all of Wife's contentions regarding the Property and the related loans and trust deeds are moot because she entered into the Stipulation and signed the Deed, as described above, which precludes us from providing the parties with effectual relief. (Cf. *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888 [appeal is moot when appellate court decision cannot have any practical impact or provide parties with effectual relief].) He also argues that by signing the Stipulation and Deed, Wife expressly waived her interest in the Property, as well as any community property interest arising out of the LMRV and Citibank loans and trust deeds, whether in the form of proceeds, reimbursement, or an equalizing payment. (Cf. *Howeth v. Coffelt* (2017) 18 Cal.App.5th 126, 131 [consent judgments are not appealable]; *Papadakis v. Zelis* (1991) 230 Cal.App.3d 1385, 1387 [party cannot appeal from stipulated judgment].)

On November 17, 2021, we issued an order stating that we would consider Husband's request for judicial notice together with the appeal. We

50

now grant his request and take judicial notice of the Stipulation and Deed. (Evid. Code, §§ 452, subds. (d), (h), 459, subd. (a).) Nevertheless, because we disposed of Wife's contentions regarding the Property and related loans and trust deeds on other grounds, as discussed above, we need not, and do not, address Husband's arguments that those contentions are moot or that she waived those contention based on the Stipulation and Deed.

HUSBAND'S CROSS-APPEAL

V

*Section 2640 Reimbursement Award to Wife*

In his cross-appeal, Husband contends that substantial evidence does not support the trial court's section 2640 reimbursement award of $550,000 to Wife for her down payment contributions toward the purchase of the Property. In particular, Husband argues the trial court erred by finding that his gifts or other transfers of cash to her (apparently totaling $400,000, which gifts were the source, in part, of her down payment(s) toward the Property purchase) were gifts of tangible articles of a personal nature under section 852, subdivision (c), and therefore were transmuted to her separate property and thus she was entitled to section 2640 reimbursement. He also argues that substantial evidence does not support the court's implied finding that Wife presented sufficient documentary evidence tracing the source of the remaining $150,000 amount for her down payment(s) to her separate property.

A

At trial, Wife testified that she contributed a total of $600,000 toward the down payment for the purchase of the Property. She testified that the sources of her down payment(s) were: (1) cash gifts from Husband; and (2) money her mother had left for her grandchildren on her passing in 2013.

51

Specifically, Wife testified that she had received a $180,000 check from Velocity Properties, LLC (Husband's separate property), which she believed she deposited in her separate Wells Fargo Bank account and then transferred into her LMRV "investors account." She also testified that she had $370,000 in her separate Citibank account, which apparently came from a combination of cash gifts from Husband and transfers of funds from her brother from her mother's estate, and then transferred those funds to her LMRV account. In particular, Wife testified that she received $150,000 from her mother's estate, including a $100,000 transfer from her brother from her mother's estate, which amount she invested in her LMRV account for the grandchildren.[11] She testified that in or about late January 2016, she transferred a total of $550,000 from her LMRV account to the escrow account toward the down payment for the purchase of the Property. Wife also testified that her brother (who apparently had acted as the parties' agent in purchasing the Property) credited them $50,000 from his commission. In her trial brief, Wife sought section 2640 reimbursement of $550,000 for her separate property down payments of $180,000 and $370,000 that were made to escrow to purchase the Property.

In its statement of decision, the trial court stated:

"[Wife] testified that $180,000 of her separate property funds (her 'account' held at LMRV) were transferred to escrow. [Citation.] [Wife] further testified that a $370,000 wire transfer from LMRV [citation] was also a contribution to the home purchase that she made from her 'account' held at LMRV. She asserts that the $50,000 agent discount her brother, their agent in the purchase, provided to [Wife and Husband], should also be credited to her. Although

---

11    Wife testified that she received a total of $150,000 from her mother's estate, including the $100,000 transfer from her brother, but could not recall when or where she received the remaining $50,000.

52

[Husband] testified that it appeared that sums of money were transferred from [Wife's] [LMRV] 'account,' he believes he should be credited for one[-]half of that amount because he provided her much of the money.

"The Court finds the money in [Wife's] account was either money held for the benefit of her mother's grandchildren, or gifts from [Husband]. [Husband] objects that the cash was not gifts and that (if gifts) gifts of cash do not meet the criteria of Family Code [section] 852, i.e.[,] 'tangible articles of a personal nature.' The Court finds, based on the testimony of both parties, that [Husband] did indeed make frequent and regular gifts of cash to [Wife] and that the parties treated cash gifts in a similar fashion to any other 'tangible article of a personal nature.' The Court finds [Wife's] testimony credible as to her *Family Code* [section] *2640* claim."

However, the court rejected Wife's claim for section 2640 reimbursement for her brother's $50,000 reduction in his sales commission. The court found that Wife had established her section 2640 claim and awarded Wife $550,000 in reimbursement.

B

As discussed above, under California's community property law, property acquired before marriage and property acquired during marriage by bequest, devise, or descent are presumptively the separate property of a spouse (§ 770, subd. (a)) and other property acquired during marriage is presumptively community property (§ 760). (*Brandes*, *supra*, 239 Cal.App.4th at p. 1472.) Section 850 provides that, subject to certain statutory provisions (e.g., § 852), married persons may transmute property by agreement or transfer (e.g., from community to separate property, from separate to community property, or from one spouse's separate property to the other spouse's separate property). Importantly, section 852 provides:

"(a)  A transmutation of real or personal property is *not valid unless made in writing by an express declaration* that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected.

[¶] . . . [¶]

"(c)  This section *does not apply to a gift between the spouses of* clothing, wearing apparel, jewelry, or *other tangible articles of a personal nature that is used solely or principally by the spouse to whom the gift is made* and that is not substantial in value taking into account the circumstances of the marriage.

"(d)  Nothing in this section affects the law governing characterization of property in which separate property and community property are commingled or otherwise combined. . . ."  (Italics added.)

Also, as discussed above, when a spouse contributes separate property funds to acquire community property and thereafter seeks section 2640 reimbursement, that spouse has the burden to provide documentary evidence tracing the contributions to a separate property source.  Section 2640, subdivision (b) generally provides: "[T]he party *shall be reimbursed for the party's contributions* to the acquisition of property of the community property estate *to the extent the party traces the contribution to a separate property source.*"  (Italics added.)

C

Husband argues that the trial court erred by finding his cash gifts to Wife were exempt from section 852, subdivision (a)'s requirement that a transmutation of personal property be made in writing by an express declaration by him because they were gifts of "tangible articles of a personal nature" within the meaning of section 852, subdivision (c).  In support of his argument, he cites *In re Marriage of Buie & Neighbors* (2009) 179 Cal.App.4th 1170 (*Buie*), in which we construed the language of section 852,

54

subdivision (c) in the context of a gift to a spouse of an automobile. In *Buie*, the husband purchased a Porsche automobile with a check in the amount of about $60,000 drawn on the wife's bank account, which held funds from the sale of her separate property residence. (*Buie*, at p. 1172.) The husband apparently considered the automobile to be a gift from the wife, having been purchased shortly before his birthday. (*Ibid.*) The trial court found that the automobile was a gift from the wife to the husband and then found the section 852, subdivision (c) exception applied, transmuting the automobile to the husband's separate property without an express declaration in writing that is generally required for transmutations under section 852, subdivision (a). (*Buie*, at pp. 1172-1173.) In particular, the trial court found that the Porsche automobile was a gift of a "tangible article[ ] of a personal nature" within the meaning of section 852, subdivision (c). (*Buie*, at pp. 1172-1173.)

On appeal, we addressed the question of whether an automobile could be considered a "tangible article[ ] of a personal nature" within the meaning of section 852, subdivision (c). (*Buie*, *supra*, 179 Cal.App.4th at p. 1173.) Citing the section 760 presumption that all property acquired by a married person during marriage is community property, we first concluded that "the default classification of the Porsche is community property, as it was acquired during the marriage." (*Buie*, at p. 1173.) We then addressed the question of whether that community property had been transmuted to the husband's separate property, noting that section 852, subdivision (a) sets forth the general rule that for transmutations of property to be valid they must be made in writing by an express declaration by the spouse whose interest in the property has been adversely affected. (*Buie*, at p. 1173.) We noted that section 852, subdivision (c) provides an exception to that general rule, allowing a gift from a spouse of a "tangible article[ ] of a personal

55

nature" that is not substantial in value to be transmuted to the other spouse's separate property without the writing otherwise required by section 852, subdivision (a). (*Buie*, at p. 1173.) Because the wife in that case did not create a writing stating that she intended to transmute the Porsche to the husband's separate property, we concluded the Porsche would be deemed community property unless it was a tangible article of a personal nature within the meaning of section 852, subdivision (c). (*Buie*, at p. 1174.)

In *Buie*, we concluded that the Porsche automobile was *not* a "tangible article[ ] of a personal nature" within the meaning of section 852, subdivision (c). (*Buie*, *supra*, 179 Cal.App.4th at p. 1174.) We stated that the statutory language required a qualifying gift to be "a gift between the spouses of clothing, wearing apparel, jewelry, or other tangible articles of a personal nature that is used solely or principally by the spouse to whom the gift is made," citing section 852, subdivision (c), and noted that a Porsche automobile was obviously not "clothing, wearing apparel, [or] jewelry." (*Buie*, at p. 1174.) We concluded that the statutory language "tangible article[ ] of a personal nature," standing on its own, was ambiguous as to whether an automobile could qualify under that phrase. (*Ibid*.)

Given the ambiguity of that statutory language in section 852, subdivision (c), we considered the statute's legislative history in interpreting its language. (*Buie*, *supra*, 179 Cal.App.4th at p. 1174.) We noted that the statutory text in section 852, subdivision (c) was originally enacted in 1984 as part of former Civil Code section 5510.730, based on a recommendation of the California Law Revision Commission. (*Buie*, at p. 1174.) We further noted that the Commission Report commented that the language of a related statute proposed by the Commission regarding gift presumptions (i.e., proposed Civ. Code, § 5110.640, subd. (b)), mirrored much of the language of

56

former Civil Code section 5510.730. (*Buie*, at p. 1174.) We also noted that the Commission Report stated that proposed Civil Code section 5110.640, subdivision (b) would provide that " '[c]lothing, wearing apparel, jewelry, and other tangible articles of a personal nature, used solely or principally by the person, are presumed to be the person's separate property except to the extent they are substantial in value taking into account the circumstances of the marriage.' [Citation.]" (*Buie*, at pp. 1174-1175.) We then stated: "Important to our analysis, the Commission Report's comment to this section contains the following statement: '[I]nterspousal "gifts" are presumed to be separate or community property depending on the nature of the property given. Under [proposed] section 5110.640, the gift of an automobile, for example, would not create a presumption that the property is separate, since *an automobile is not an article of a personal nature within the meaning of the section*.' [Citation.]" (*Buie*, at p. 1175.) We stated: "Based on this legislative history, we conclude that the gift of an automobile does not fall within the exception set forth in section 852, subdivision (c) because it is not a 'tangible article[ ] of a personal nature.' [Citation.] Accordingly, the family court erred in relying on section 852, subdivision (c) to conclude that the Porsche was [the husband's] separate property." (*Buie*, at p. 1175.)

Similarly, in *In re Marriage of Cross* (2001) 94 Cal.App.4th 1143 (*Cross*), the court stated: "Section 852 and cases interpreting section 852 or its predecessor, Civil Code former section 5110.730, address situations where a couple may agree to transmute the separate property or community property character of real or personal property—e.g., where a wife agrees to convert her separate property residence to community property, or *where a wife buys a car for her husband with community property funds. Such a transmutation* in the character of the real or personal property *must be*

57

*evidenced by a writing.*"  (*Cross*, at pp. 1147-1148, italics added.)  By so stating, *Cross* implicitly concluded that a gift of an automobile is not a gift of a tangible article of a personal nature under section 852, subdivision (c) and therefore required an express declaration in writing under section 852, subdivision (a) to effect a transmutation to separate property.

Here, Husband argues, and we agree, that gifts of cash are no more gifts of "tangible articles of a personal nature" than gifts of automobiles. Therefore, we conclude that our holding in *Buie* is dispositive on the question of whether section 852, subdivision (c) excludes gifts of cash from section 852, subdivision (a)'s general requirement for an express declaration in writing for a transmutation to separate property.  We further note that cash is distinctly dissimilar to "clothing, wearing apparel, jewelry, or other tangible articles of a personal nature that is used solely or principally by the spouse to whom the gift is made" under section 852, subdivision (c)'s language.  Cash is *not* worn like clothing or jewelry and is *not* an "other tangible article[ ] of a personal nature" that is "used" solely or principally by the other receiving spouse. (§ 852, subd. (c).)  Accordingly, contrary to Wife's assertion, Husband's gifts of cash to her cannot, as a matter of law, be considered gifts of "tangible articles of a personal nature," within the meaning of section 852, subdivision (c), regardless of the parties' conduct or whether or not they intended those cash gifts to so qualify (which conduct or intent the trial court here apparently deemed either dispositive or relevant).  Because the record does not show Husband created or made any writing expressly declaring his intent to transmute his cash gifts to Wife's separate property as section 852, subdivision (a) requires for a transmutation, we conclude the trial court erred by finding Husband's gifts of cash to Wife were transmuted to her separate property and, based on that erroneous finding, by awarding Wife section 2640

reimbursement for her contributions from those cash gifts to the down payment for the purchase of the Property (presumably totaling $400,000), which contributions were not traced to her separate property.[12] (*Buie, supra,* 179 Cal.App.4th at p. 1175; see also, *Cross, supra,* 94 Cal.App.4th at pp. 1147-1148.)

D

Husband also argues that the trial court erred by awarding Wife reimbursement for her contribution of the remaining $150,000 toward the down payment that came from her mother's estate because she did not present sufficient documentary evidence tracing those funds to her separate property as required by section 2640, subdivision (b).[13]

As discussed above, to the extent a spouse's separate property funds are commingled with community property, those separate property funds are presumed to be community property unless the spouse rebuts that presumption with documentary evidence tracing the funds to the spouse's separate property. (See, e.g., *See, supra,* 64 Cal.2d at p. 784; *Murphy, supra,* 15 Cal.3d at p. 919; *McLain, supra,* 7 Cal.App.5th at p. 274; *Braud, supra,* 45

---

[12]    Contrary to Wife's apparent assertion, the fact that the cash gifts had been deposited, invested, or otherwise held in her LMRV account did not necessarily make those funds her separate property.  Rather, section 2640 required that she trace those funds to a separate property source and not to gifts of cash from Husband without a writing in which he expressly declared he was transmuting the funds to her as her separate property.

[13]    Because we addressed above the trial court's award to Wife of section 2640 reimbursement for cash gifts by Husband presumably totaling $400,000, which she contributed toward the down payment for the Property purchase, we now address only the remainder of $150,000 of the court's total $550,000 section 2640 reimbursement award to her, which amount it implicitly found came from her mother's estate and was therefore her separate property.

59

Cal.App.4th at pp. 822-823; *Frick, supra,* 181 Cal.App.3d at p. 1010.) On appeal, we review a trial court's finding of fact regarding whether a spouse has adequately traced funds to a separate property source for substantial evidence. (*Braud,* at p. 823.) If substantial evidence supports that factual finding, we must uphold it even if there is conflicting evidence that supports contrary inferences. (*Grinius, supra,* 166 Cal.App.3d at p. 1185; *Beam, supra,* 6 Cal.3d at p. 25; *Schmidt, supra,* 44 Cal.App.5th at p. 582.)

To meet section 2640, subdivision (b)'s tracing requirement, a spouse generally must present one of two types of proof. In *Braud,* the court stated: "Either of two tracing methods may be utilized to characterize the disputed property interests: 'direct tracing,' or 'family living expense tracing.' [Citation.]" (*Braud, supra,* 45 Cal.App.4th at p. 823.) Because neither Wife nor Husband argues that the latter method was, or should have been, applied in the circumstances of this case, we describe only the first method of "direct tracing." *Braud* stated: "Under the 'direct tracing' method, the disputed asset . . . is traced to the withdrawal of separate property funds from the commingled account. This method requires specific records reconstructing each separate and community property deposit, and each separate and community property payment as it occurs. Separate property status cannot be established by mere oral testimony of intent or by records that simply total up all separate property funds available during the relevant period and all the separate property expenditures during that period; such records do not adequately trace to the source of the purchase at the time it was made. [Citations.]" (*Ibid.*) Accordingly, under the "direct tracing" method, "if separate property is commingled with community property in a bank account, then the owner of the separate property has the burden of keeping records establishing community funds were exhausted when the purchase was

60

made." (*McLain*, *supra*, 7 Cal.App.5th at p. 273.) In short, "tracing requires documentary proof." (*Id*. at p. 274.)

As discussed above, Wife testified that she had $370,000 in her separate Citibank account, part of which came from transfers of funds from her brother from her mother's estate, which she then transferred to her LMRV account (presumably thereby commingling those funds with Husband's cash gifts). She testified that she received $150,000 from her mother's estate, which funds her mother had left for her grandchildren. In particular, Wife testified that her brother had transferred $100,000 to her from her mother's estate, which amount she invested in her LMRV account for the grandchildren. In or about late January 2016, she transferred a total of $550,000 from her LMRV account to the escrow account toward the down payment for the purchase of the Property. By expressly finding Wife's section 2640 reimbursement claim to be credible, the trial court implicitly found credible Wife's testimony that she had received $150,000 from her mother's estate and that those funds were therefore her separate property.

Husband argues that Wife provided only her testimony, and no documentary evidence, to trace her contributions to the down payment for the Property purchase to her separate property and therefore there is insufficient evidence to support the trial court's award to her of section 2640 reimbursement in the total amount of $550,000, which amount presumably included the $150,000 amount Wife testified she received from her mother's estate as her separate property. In particular, Husband cites Wife's testimony regarding the source of the $150,000 amount that she testified she received from her mother's estate and then presumably commingled with Husband's cash gifts in her LMRV account. In particular, Husband cites to his counsel's question of Wife asking her, "What document . . . indicates you

received $150,000 from your mother?" Wife answered: "My brother had given me [$]100,000, which he was holding for me to invest in [LMRV]." Husband's counsel then asked: "And how did your brother give you the $100,000?" Wife answered: "That's between him and my mother. I really would rather not talk about my mother. She passed away, and it's a big heartache for me." Husband also cites Wife's testimony that in 2014 or 2015 she received from her brother a check for $100,000 from her mother's estate, which check she believed she deposited in her Wells Fargo Bank account and then transferred the funds to her LMRV account. However, she could not recall when or where she received the remaining $50,000 from her mother's estate.

Husband asserts that Wife did not provide any documentary evidence showing she received $150,000 from her mother's estate and, in particular, did not present a copy of the $100,000 check that her brother delivered to her. Absent such documentary evidence, he argues substantial evidence does not support the trial court's finding that Wife's contribution of $150,000 toward the Property purchase, which amount came from her mother's estate, was Wife's separate property and therefore she was entitled to section 2640 reimbursement for that amount. In opposing Wife's section 2640 reimbursement claim at trial, Husband presented the expert testimony of William Duerksen, who testified that he had examined Wife's accounts and found only $103,000 in her accounts had come from her brother and his reports were admitted in evidence. He further testified that Wife had transferred $65,000 to her brother. Based on Duerksen's testimony and documentation, Husband argues that substantial evidence does not support Wife's testimony, and the court's finding based thereon, that she received $150,000 from her mother's estate. Husband argues that the documentary evidence shows Wife's brother transferred to her a net amount of only

62

$38,000 (i.e., $103,000 less $65,000). Even so, he argues Wife did not present any documentary evidence showing that money came from her mother's estate (e.g., she did not present any copies of her mother's will, trust, or probate documents). Therefore, Husband argues substantial evidence does not support any part of the $150,000 amount the trial court impliedly found that Wife received from her mother's estate as her separate property and for which she was entitled to section 2640 reimbursement for contributing it toward the Property's purchase price.

Based on our review of the record, we, however, conclude Husband has not carried his burden on appeal to show that substantial evidence does not support *any* part of the $150,000 amount the trial court found came from Wife's mother's estate and was therefore Wife's separate property for which she was entitled to section 2640 reimbursement. Rather, the record includes exhibit 680, which was Duerksen's draft tracing report that was admitted in evidence and on which he testified. That documentary evidence showed that on April 13, 2015, Wife received $100,000 from her brother, Alain Perez, and that on April 24, 2015, she transferred $100,000 to her LMRV account. Although Duerksen testified that Wife transferred $65,000 to her brother, Husband apparently misconstrues the underlying documentary evidence when he asserts that amount should be deducted from the $100,000 amount Wife received from him. Husband appears to wrongly believe that the entire $65,000 amount was transferred by Wife to her brother *after* his April 13, 2015 transfer of $100,000 to her. Our review of the evidence shows otherwise. Specifically, exhibit 680 shows that on September 4, 2014, Wife's brother transferred $3,000 to her and on April 13, 2015, he transferred $100,000 to her. Exhibit 680 also shows that Wife made a number of transfers to her brother, totaling $65,000, but most of those transfers

63

(totaling $47,000) occurred *before* he made the $100,000 transfer to Wife on April 13, 2015. Wife made only three transfers (totaling $18,000) to her brother after April 13, 2015: (1) a $5,000 transfer on August 17, 2015; (2) an additional $5,000 transfer on August 17, 2015; and (3) an $8,000 transfer on October 9, 2015.

Considering exhibit 680, along with the testimony of Wife and Duerksen, we conclude that there is substantial documentary evidence to support the trial court's finding that Wife adequately traced her contributions toward the purchase price for the Property to her separate property, but only to the extent of the $100,000 amount that she testified she received from her brother from her mother's estate. Wife's receipt of that $100,000 check was supported by the documentary evidence discussed above (i.e., exh. 680), Duerksen's expert testimony tracing her deposit of that check into her account, and her testimony that she received the check from her brother. Furthermore, contrary to Husband's apparent assertion, Wife was not required to present specific documentary evidence (e.g., will, trust, or other probate document) showing that the $100,000 amount came from her mother's estate and Husband does not cite any statute or case requiring such documentary evidence. Rather, the trial court could reasonably infer from Wife's testimony and her receipt of her brother's check that the source of the $100,000 amount was from her mother's estate and therefore was her separate property. If, as Husband apparently asserts, that amount did not come from her mother's estate or was otherwise not her separate property, he presumably would have presented opposing testimony or other evidence at trial showing that it, instead, came from their community property or his separate property. The absence of such evidence showing the $100,000 payment from her brother came from a source other than her brother from

64

her mother's estate provides support for the court's finding that it came from her mother's estate and was therefore Wife's separate property.

We further conclude that Husband has not carried his burden on appeal to show substantial evidence does not support the court's $100,000 section 2640 reimbursement to Wife based on her receipt of that amount from her brother from her mother's estate, *without* a deduction he apparently suggests is required for the $65,000 total amount that Wife transferred to her brother. First, as discussed above, exhibit 680 shows that $47,000 of the $65,000 total amount was transferred by Wife to her brother before she received the $100,000 check from him. Clearly, the court could reasonably infer that those payments to her brother were irrelevant or, at least, unpersuasive in determining whether the $100,000 check that Wife later received from him from her mother's estate was her separate property. Second, regarding the three payments, totaling $18,000, that Wife made to her brother after he delivered the $100,000 check to her, the court could reasonably infer that those funds did not come from her $100,000 in separate property from her mother's estate, but instead from other sources (e.g., Husband's cash gifts, community property, etc.). Husband did not present evidence below showing that Wife's $18,000 in payments to her brother necessarily came from her $100,000 in separate property and, instead, apparently suggests on appeal that we make that inference contrary to the trial court's implied finding. In so doing, he misconstrues and/or misapplies the substantial evidence standard of review. As discussed above, in applying the substantial evidence standard of review, we must affirm the trial court's finding if substantial evidence supports it, even if other substantial evidence would have supported a contrary finding. (*Schmidt*, *supra*, 44 Cal.App.5th at p. 582.) We cannot reweigh the evidence, substitute our own inferences from

the evidence, or make different assessments of credibility from the trial court's assessments. (*Ibid.*; *Ana C., supra*, 204 Cal.App.4th at p. 1329.) Therefore, construing the evidence and inferences therefrom favorably to support the trial court's finding, we conclude substantial evidence supports its implied finding that there was adequate documentary evidence in the record tracing Wife's $100,000 contribution toward the Property purchase price to her separate property and, based thereon, its award of section 2640 reimbursement to Wife in the amount of $100,000.[14]

Nevertheless, although we conclude substantial evidence supports a section 2640 reimbursement award to Wife for her $100,000 contribution toward the Property's purchase price, we conclude that substantial evidence does *not* support the trial court's award of the remaining $50,000 amount of the $150,000 amount she testified she received from her mother's estate. We

---

14    To the extent Husband so argues, construing the evidence and inferences therefrom favorably to support the trial court's findings, we further conclude that substantial evidence supports the trial court's implied finding (e.g., based on exhibit 680 and other documentary evidence, Duerksen's expert testimony, and Wife's testimony) that under the "direct tracing" method there were specific records admitted in evidence reconstructing each separate and community property deposit, and each separate and community property payment as it occurred, which records showed the community funds and Husband's cash gifts that had been commingled with Wife's separate property in her LMRV account were exhausted when she contributed the $100,000 amount from her separate property toward the Property's purchase price. (*Braud, supra*, 45 Cal.App.4th at p. 823; *McLain, supra*, 7 Cal.App.5th at p. 273; cf. *In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1059 [detailed records showing separate property was used were not necessary because other evidence sufficiently showed respective amounts of separate property and community property in commingled account such that it could be presumed after community funds were exhausted that subsequent payments came from separate property].) Husband has not carried his burden on appeal to persuade us otherwise.

are unaware of, and Wife does not cite, any documentary evidence tracing that $50,000 amount to Wife's separate property, whether from her mother's estate or otherwise. Furthermore, although the trial court found Wife's section 2640 claim to be credible, the credibility of Wife's testimony regarding her receipt of $150,000 (which included that $50,000 amount) from her mother's estate is insufficient, by itself, to trace that amount to her separate property in the absence of supporting documentary evidence. (*Braud, supra,* 45 Cal.App.4th at p. 823; *McLain, supra,* 7 Cal.App.5th at pp. 273-274.) Based on our conclusions above, we hold that only $100,000 of the $550,000 amount awarded to Wife in section 2640 reimbursement for her separate property contributions toward the Property's purchase price is supported by substantial evidence under applicable legal principles. Accordingly, we reverse and vacate $450,000 of the $550,000 award to Wife as erroneously awarded by the trial court and modify its judgment accordingly.

## DISPOSITION

The judgment is reversed to the extent that it awards Wife $450,000 in section 2640 reimbursement to Wife. $450,000 of the total $550,000 section 2640 reimbursement award to Wife is vacated. The judgment is modified accordingly to award Wife $100,000 in section 2640 reimbursement and, as so modified, the judgment is affirmed. The parties shall bear their own costs on appeal.

O'ROURKE, Acting P. J.

WE CONCUR:

DATO, J.

BUCHANAN, J.